Good morning, your honors. If it pleases the court, I believe that the primary issue in this matter, I think there are two primary issues in this matter, but one of them is credibility of the witnesses for the respondent, AOC, and also what the law is. We're not going to look at credibility here in an appellate court, though, are we? No, no, sir. You're not, except for the fact that based on my arguments dealing with path dependency and dealing with the ideas of precedential cascades as such, the court is able to determine through looking at Solomon 1, the first case that your honor heard a number of years ago, I think about two years ago, you heard that case, and I would urge the court to listen to the tape of that oral argument also. It was determined that certain factors led to his not being deprived of reasonable accommodation for religious accommodation. However, if you look, those same factors were tossed to the curb when it came to the matter of his discharge. And when you juxtapose the factors used in Solomon 1 to deprive him of religious accommodations and put that next to what was used to place him on administrative leave in the fourth case, which was dealt with his discharge, you would find that… Mr. Lee, can you be a little more specific? I read your brief and I heard what you're saying right now is what you said in your brief, but I couldn't tie it up to exactly what went wrong in the religious accommodation case or what went right or wrong and how what happened in that case is reversibly pertinent to what happened in this case. Well, what I'm saying is what happened in the first case is based on undue hardship. In the case on religious accommodation, based on undue hardship, which was that they would not engage a temporary grill cook because it would cost too much money, because he would have to learn where the pots and pans were, he would have to learn what the limited menu was. And because he needed the necessary personality of this specific Mr. Solomon, the AOC would not engage a temporary grill cook for purposes of allowing him to take some time to devote to his religious devotions. Now, in this fourth case, nobody is saying that you have to go back to the first case for doing anything with respect to that first case, but all credibility determinations were made based on that alleged undue hardship, which we argued was not an undue hardship in any manner, shape, or form. Wasn't it too late? I'm sorry? If the judgment before was that it would be an undue hardship for the institution to hire a temporary person to flip the hamburgers or whatever, and if there was substantial evidence to support the conclusion that there was an undue hardship in those circumstances, it would seem to me that that's locked down. That's sort of put in the bank, and you can't come back and tell me now that there's a mistake. Well, I argued that it was a mistake, and I argued that it was a misrepresentation. However, that misrepresentation was not revealed until this— Misrepresentation. Tell me where the misrepresentation was. That in no matter of circumstances or form was it a hardship to hire a temporary grill cook. It was argued, and it was based on a declaration of a man who had never even seen what it would cost that it would be an undue hardship. I may be missing something, but it sounds to me like you're trying to re-argue the religious accommodation. No, sir. All I'm trying to show that if you look at substantial evidence in the first case on which that was based, and it was found to have been substantial evidence, and then you look at the substantial evidence that is in this case, where it's diametrically opposed to the same idea that was substantial in the first case. In other words, when the verbal argument— To the point where I hear you talking, but I'm not following you. When the verbal argument— This case is diametrically opposed because— Because immediately after a verbal argument, Mr. Solomon was placed on administrative leave, and he was paid, and a temporary grill cook were both paid a salary for six months. Therefore, it was not a temporary hardship to pay the salary for a temporary period of time. The second thing, he was placed on administrative leave the very next day after a heated discussion with the same general manager, Savage. There was no problem in teaching the temporary grill cook the very next day where the pots and pans were and where the— I recall the hiring of the temporary grill cook in the previous case was over a holiday period. It was right before a holiday period. The circumstances of being able to find somebody and all that was, I believe, those facts were, if you will, the temporary hardship issue was covered by those facts. No, sir. I would respectfully— One might say that. But they didn't say that. In this case, there were no such problems, right? I would respectfully say to you that that was not expressed by the architect's office, that it was a holiday and we couldn't get anybody at that time. I would also say to you that there were grill cooks available. But be that as it may, the fact that Christmas was coming or there was going to be a temporary recess— In order for you to prevail, you've got to show retaliation, a motive to retaliate, don't you? Yes, I do. And I believe the motive to retaliate was based on his participation in the federally protected activities in both the first case and the third case, which this court has heard. But then isn't there a record here by the lower fact-finding body that is contrary to what your argument is? It may very well be contrary. But if the fact that somebody has been using the judicial system and the administrative judicial system to misrepresent what the facts were and they're only revealed later on by later facts, then you have to look at it and then you have to say, well, if these later facts show that they were disingenuous in the beginning, I say that you cannot provide credibility to these same people in the final case, in the discharge case, or even in the second case, which deals with the sick leave restriction. Returning to the issue here of the confrontation between Mr. Solomon and his supervisor, where is the lack of substantial evidence for the proposition that that steps outside of the normal relationship that an employee should have with their supervisor? I cannot speak to the normal relationship between an employee and their supervisor within the AOC. I can only speak to the idea that if you look at what the Office of Compliance has done with the idea of violence in the workplace, they themselves in the Duncan matter, which is still before the court hearing was argued some time ago, they themselves determined in that case the Office of Compliance itself said that where the supervisor assaulted the employee, it was a matter of foolishness and there was nothing ever done about violence in the workplace. So when you say what is violence in the workplace in the office of the architect, that's a very difficult proposition for me to answer to your honor, because it's a double or triple standard depending upon who is being violent and who is raising their voice. Mr. Solomon himself was a known licensed religious practitioner. He was a known and licensed minister. He is known as being nonviolent and all of a sudden because there is a heated... How does he explain the numerous apparent sick leave abuses on the record? The numerous sick leave abuses were all explained on the record by his calling appropriately, his calling inappropriately, his use of the appropriate medical certificate, which was a prognosis. He's saying he was sick, he came to see me, he's due to go back to work at such and such a day. That is all you need at that time. The fact that the restaurant people wanted to impose something that had already been superseded does not make it right and he was entitled from his supervisor for an answer to his questions with respect to what is it that you're doing. This is outside the regulations that are applicable here. If your honor, please, I was not present at the altercation, at the argument. I can say that I am more often than not louder than Mr. Solomon, even in a closed circumstance. Perhaps now I might be louder than Mr. Solomon. And Mr. Solomon happens to gesticulate with his hands as I've been known to do, and I don't mean in a derogative manner. And the fact that it was not his demeanor, it was not the loudness of his voice, it was his words that disturbed Mr. Savage because Mr. Solomon knew more about the rules and the regulations and the law applicable to the AOC and Mr. Savage, and he spoke truth to power and he would simply not accept what Mr. Savage said and Mr. Savage just would not respond in a manner the supervisor should have responded to and was obligated to respond to in terms of his position as supervisor, saying, why do you need this? Why do you need this? Not simply, it says in a restaurant directive, which had already been superseded. It says in the interim chapter 630, the sick leave policy, all directives from your separate jurisdictions are superseded by this uniform policy. And he responded in all his paperwork and all his medical certificates, and otherwise he was not absent. He was penalized and placed on leave restriction, and he was penalized and requested a prognosis and diagnosis when it was not necessary and it was in violation of the same federal statutes that I believe your honors are under in terms of the chapter 63 of the U.S. Code. Would you like to save the rest of your rebuttal time? Thank you. Ms. Corcoran? Yes. May it please the court, my name is Kelsey Brown Corcoran. I represent the Office of the Architect of the Capitol, which is the employer here. I'll be sharing oral argument time with my colleague, Bill Wachter, who represents the Office of Compliance, which adjudicated the complaints below. We'll both be urging affirmance of the board's decisions. The two cases that have been... Ms. Corcoran, I have a couple of problems here. Let me tell you what they are. Okay. Do you have the record there? I've got portions of it, yeah. Would you look at page 33 of the appendix? 33 of the appendix. There's a statement here on the question of whether the managers were aware of Solomon's protected activity. In the middle paragraph, the hearing officer said, it's very probable that they knew, but that there isn't any evidence that they knew. Right. That strikes me as directly inconsistent. That's very strange. Yes. My understanding is that there was no evidence presented at the hearing that they were, in fact, aware. How can you say on the one hand it's very probable and then reach a conclusion that it didn't happen? It's bizarre. Yeah. I suspect the hearing officer was just speculating about the fact that they were supervisors. But he's not supposed to say things like that. How can we trust his findings if he says something like that? Well, the findings were adopted by the board. Well, including that one. Including that one. Even if we were to accept that the rest of our managers were aware that Mr. Solomon had filed his complaint, it would not lead to the conclusion that they had retaliated against him in putting him on leave restriction at that time. That doesn't affect the causation finding. It would be a piece of evidence that would go towards causation. But there was a full hearing here, and Mr. Solomon had the burden of demonstrating retaliation and temporal proximity in itself is not sufficient to establish causal connection. Well, take a look at 39, the same decision. And he says that in determining whether there was a retaliation here, I can't interpret the regulations to find out whether they were violated. That strikes me as an equally strange comment. That's exactly what he's supposed to do, right? The personnel manual is silent on this particular issue. And I think what his conclusion was is that whether or not the ---- But his idea that he doesn't have authority to interpret the regulations in connection with determining whether there was retaliation is just wrong, right? I think he ---- I imagine ---- I think what he was saying here is that it didn't affect the outcome of this case. Well, maybe so, but that's not what he said. He said, I don't have authority to interpret. That's wrong, right? I don't think he said he didn't have authority. He said he was unable to make a determination himself, looking at it, whether or not there was a policy one way or another. Well, yes, he says the hearing officer has no authority to decide questions concerning proper application. But that could be a predicate issue to the retaliation. So to the extent that he thinks he doesn't have authority to decide whether there was correct action or not, he's wrong about that, right? Yeah, I interpret his statement about authority to mean that he believed it was outside the scope of his determination he needed to make here and that it didn't go to the issue of retaliation. Let me mention my final concern, and that is the architect of the capital seems to have a policy of not making a hearing officer's determination available to the employee. That strikes me as very strange, right? In the normal civil service system, if there is a proposal to remove somebody and a finding of the grounds for removal, that would be supplied to the employee so the employee could comment on it before the decision was made by the deciding official, right? Yes, I think that's right, but we don't have- Why does that not happen with the architect of the capital? It's an internal policy. My understanding is that the architect of the capital is reviewing that policy and may change it in the future. I don't think that even if one were to accept that that policy was inappropriate for some reason or implicated due process concerns, it wouldn't lend any credence to the retaliation claim here, so I would respectfully suggest that it's outside the scope of what this court needs to consider in this case because it was a written policy either way and even if- It sounds to me like a very strange policy. I will say I learned yesterday as I was preparing for this argument that Mr. Solomon filed a constitutional tort lawsuit in the District Court of the District of Columbia and it was challenging his termination on exactly the reason that you just mentioned and it was dismissed several months ago and next week we'll send a letter to the court with the citation. I have it here as well. I apologize that we didn't make you aware of it before but all of those issues have been considered by a district court judge and dismissed on 12B6 grounds. Okay. Are there any further questions? Then I will cede the rest of my time to my colleague Bill Wachter. Mr. Wachter. May it please the court. With respect to all of these allegations, the five allegations of retaliation, both hearing officers found that with respect to all five allegations there was no prima facie showing a retaliatory motive. Those findings were adopted by the board. They are clearly supported by substantial evidence. In none of the cases was there any evidence that he was singled out for any special treatment. There is not a scintilla of evidence of disparate treatment. He was not treated differently than any other AOC employee with respect to any of these issues including the Hantman issue. There's not even a whisper of evidence that there was on the part of any AOC official. What about Mr. Lieb's concern about disparate treatment? He said he makes reference to a case where his supervisor used physical force and received less severe penalty. If you're referring to the 1995-1999, we're not talking about the religious case at all. We're not talking about that. We're talking about the 1999 Kiriakis incident. In that incident, there was a disciplinary letter, I believe, that was either issued to or considered to be issued to both Mr. Salman and Mr. Kiriakis, if I've got his name correct. In that situation, there was not the element of confrontation that there was in this case. In this case, Mr. Savage was cornered into a room that was 6 by 13 feet. Mr. Kiriakis was able to walk away from this encounter. It's not true that Mr. Salman was not disciplined in that situation. At least there was consideration of the discipline and they were both warned not to engage in this conduct. Again, so there was a difference. The scary situation here was that this larger Mr. Salman is boxing in a smaller supervisor who cannot physically leave his desk situation without having a physical confrontation with this man. Mr. Salman admits in his testimony that he... Why does the supervisor have to get out of the office? Did the supervisor instruct Mr. Salman to leave the office? He instructed him seven or eight times and Mr. Salman concedes in his testimony that Mr. Savage asked him seven or eight times to leave and he did not leave. Ever? I mean, he obviously left at some point. He did leave at some point. His immediate supervisor... Did the supervisor have to get up and push him out or was it after a heated exchange or change of words, finally Mr. Salman left? Yes, it was more than a heated exchange. I mean, it was found by... Was there evidence that the supervisor feared for his life? Yes, there was. No, there was evidence that he felt like he was being provoked. And the other supervisor who was in this small office said that he was afraid to leave the office. The question was why didn't he get up and try to get help? And the other supervisor who was in the office said, I didn't want to leave the office because I was afraid something was going to happen. It was a scary situation at the office that morning. And now at this point his immediate supervisor comes up apparently from the grill looking for Mr. Salman and walks into the situation. And my goodness, she testified that this was not a good situation, this was an ugly situation, but she did ask him twice to leave and the second time he did, she persuaded him to leave, yes. But the other point I wanted to make was that not only is there no evidence of disparate treatment, there's also not the slightest suggestion in the record of either one of these cases that any AOC management official expressed any animosity, resentment or negativity of any kind toward Mr. Salman because of his protected activities. There simply is nothing on which to base a prima facie case of retaliation. Now, as to Judge Dyke, I read this at page 39 slightly differently. The hearing officer is saying, but absent prima facie evidence of retaliation, this hearing officer has no authority to decide questions concerning the proper application of those regulations. Without something to tie into retaliation or some kind of animus or some kind of disparate treatment, he would have no occasion or authority or jurisdiction to decide what is largely an academic question. Well, I think that's not correct. I think that if, in fact, there's been a law violation, that may bear on pretext, it may bear on all sorts of issues. And typically you would consider that sort of thing. To the extent that he believed that he was disabled from considering whether the action was well-founded or not, that seems to be wrong. I would think he'd have something more than just this question of whether the applications, whether there's a proper application of the regulations. I'm not addressing that question. I'm saying it is not irrelevant that the regulations were violated if they were violated. It is not irrelevant. It is not beyond his authority to consider that factor. Yes, I would agree with that, Your Honor. But he's saying it. He's putting the cart before the horse a little bit. He's saying, I see no evidence. I understand. I understand what you're saying. So it doesn't seem like a cardinal sin. He's saying there's no evidence here, and I don't really have to look at it. Then he goes on this other place in the opinion to say, well, it's probable that they knew, but I find they didn't. That's a little strange. Your Honor, we didn't cite that in our brief, mainly because there's so much strong evidence to support the findings that there is absolutely no nexus between the conduct and any protected activities. It does seem slightly there's tension between the two statements that he makes. The case has been briefed fairly well, over 170 pages worth, and I think it's time for me to sit down unless the court has further questions. Thank you, Mr. Wachter. I believe you have four and a half minutes remaining. With respect to the matter that's over in the U.S. District Court, it's at the United States Court of Appeals for the District of Columbia, and the argument made there in opposition to summary affirmance is the fact that, A, you are absolutely correct, it was not a policy that brought forth the deprivation of the hearing officer's report to the complainant, to Mr. Solomon. It was found in a booklet that has no provenance, that nobody knows how it came out, that it simply says it's an internal document. It was even admitted by respondents' counsel at the hearing that there was no privilege or confidentiality attached to that document itself. And it was turned over, and as described by the hearing officer of the Chapter 752 hearing, it was hyperbole by the general manager, Savage, that the discharge which was proposed had not been sustained by the architect and that they had the burden of proof. It was neither proven nor sustained, but she said she had no power to change the penalty that was imposed. The supervisor in question here testified that Mr. Solomon's participation in prior OOC hearings wasn't even a thought that went through his head, that what he was worried about was a fear and a concern that could be harmful to himself when he was confronted by Mr. Solomon. Now, there's no evidences there on the basis of that testimony of any kind of retaliation. Well, I would state that every part of the process in Solomon I and Solomon III was documented. The completed cases that were before this court was documented and presented to, and if my memory serves me, they were aware that they were federally protected activities, and I would submit to the court that he was not afraid. But the supervisor is saying, that's not on my mind. I'm instead in fear when I'm confronted. And I would say there's no credibility to that issue as determined by the court. But we started right out saying we're not going to make credibility. And I understand. But if you look at the idea that he said a whole lot of other things that were disproven in case number four that he said in case number one. So if you substitute the idea that he was afraid of the knowledge of Mr. Solomon, there was no reason to fear Mr. Solomon. So you're asking us again to question the credibility of that testimony. Yes, I would. I would ask you to look at it. I would ask you to consider the fact that the statements and the credibility of these witnesses for the respondent was not worthy of the answers based on the principles of path dependency. Well, does your case, if we're unwilling to do what you ask us to do with regard to the supervisor's testimony, to disregard it as being incredible, does your case fail? I would say it does, yes. I would have no issue with that. That's why I did not attack the findings. The only way I could attack the findings was through this other theory. Thank you for your candor. Anything further, Mr. Leed? No, thank you, sir. Thank you. Our next case is First Niagara Insurance v. First Niagara.